UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Jeffrey T. Testa, Esq.
Phillip S. Pavlick, Esq.
**McCarter & English, LLP**
100 Mulberry Street, Four Gateway Center
Newark, New Jersey 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
Email: jtesta@mccarter.com
            ppavlick@mccarter.com

and

Gregory J. Mascitti, Esq. (admitted *pro hac vice*)
**McCarter & English, LLP**
Worldwide Plaza
825 Eighth Avenue, 31st Floor
New York, New York 10019
Telephone: (212) 609-6800
Facsimile (212) 609-6921
Email: gmascitti@mccarter.com

*Counsel for Petitioning Creditors*

| | |
|---|---|
| In re:<br><br>HEALTH TECH HARBOR, INC.<br><br>        Alleged Debtor. | Involuntary Chapter 7<br><br>Case No. 20-19017 (RG) |

**DECLARATION OF PETITIONING CREDITOR ANNETTE CATINO IN OPPOSITION TO ALLEGED DEBTOR'S MOTION TO DISMISS INVOLUNTARY CHAPTER 7 PETITION**

ANNETTE CATINO, under penalty of perjury, hereby states and declares the following:

1.      I am a creditor of Alleged Debtor, Health Tech Harbor, Inc. ("HTH").  I submit this Declaration in opposition to HTH's Motion to Dismiss Involuntary Chapter 7 Petition dated August 20, 2020 [Docket No. 10] (the "Motion").  This Declaration is based on my personal knowledge and review of documents and records in my possession.

2.      I am the holder of Tranche A Note CPN-2017-1 dated November 28, 2017 issued by HTH on November 28, 2017 in the principal amount of $150,000 (the "Catino Note"). The Catino Note is attached hereto as **EXHIBIT A**.

3.      I am also the holder of notes issue by HTH on January 31, 2018 and March 2, 2018 in the aggregate principal amount of $200,000.

4.      I am not a shareholder, officer, or director of HTH, DGN Pharmacy, Inc. d/b/a PersonalRX ("PersonalRX"), or Han Benefit Advantage Inc. d/b/a BenAdvance ("BenAdvance").

**A.      Ownership and Control Over HTH, PersonalRX and BenAdvance**

5.      HTH is a Delaware corporation formed in October 2017.  HTH is owned by Lawrence Margolis and Anthony Milone.  As Margolis admits in his Declaration, he is the "incorporator, sole director, chief executive officer, president, treasurer, secretary and 56.6% shareholder" of HTH, with Milone being "the executive vice-president and 37.74% shareholder of HTH."  Margolis is also the "sole shareholder, sole director, chief executive officer and president" of PersonalRX.  (ECF No. 10-1 "Margolis Decl." ¶ 1.)  Milone is BenAdvance's "founder, chief executive officer and president" and "largest shareholder with an 18.55% equity position." (Margolis Decl. ¶¶ 7-8.)

6.      Upon information and belief, Margolis exercises control over HTH and PersonalRX, and Milone exercises control over BenAdvance.  To the best of my knowledge, with

2

the exception of a minority equity interest held by Dr. Ramachandra Malya in BenAdvance, none of the Petitioning Creditors have any equity interest in HTH, PersonalRX, or BenAdvance. Moreover, to the best of my knowledge, none of the Petitioning Creditors is a director or officer of HTH, PersonalRX, or BenAdvance or otherwise exercises any control over HTH, PersonalRX, or BenAdvance.

**B.    Creditors' Loans to HTH and HTH's Loans to PersonalRX and BenAdvance**

7.    HTH obtained loans from investors based upon Margolis' and Milone's representations that HTH would acquire the business operations of PersonalRX and BenAdvance, as well as other future acquisitions.  The confidence with which Margolis and Milone made these representations to investors is exemplified in a press release indicating that the acquisition of PersonalRX and BenAdvance had already occurred.  A copy of the press release is attached hereto as **EXHIBIT B**. On November 21, 2017, HTH issued the press release announcing that it had selected Maxim Group LLC (an investment banking firm) to provide strategic planning, investment banking and securities services for an upcoming Reg A+ offering.  The press release stated that "**Health Tech Harbor emerged from an alliance between two national health technology companies – PersonalRX and BenAdvance**."  The press release further stated that "**[a]s the first two companies in Health Tech Harbor**, PersonalRX and BenAdvance work independently as well as together, gaining efficiencies from shared resources and relationships, and identifying health tech acquisition targets well-suited to fuel growth and profitability for all companies within Health Tech Harbor."  According to the press release, Maxim Group LLC would "support Health Tech Harbor's financial growth and **expansion of its footprint** within the marketplace."

3

8.      In an email to HTH's creditors dated December 19, 2018, Margolis wrote that HTH

"is committed to completing the merger among [BenAdvance], [PersonalRX] in the [HTH]

holding company…."  In the same email, Milone further echoed Margolis's assurances and stated

"[r]egardless of the direction of our institutional financing, we will complete our merger with

[PersonalRX] and formalize the [HTH] company in the next few months…."  A copy of the

December 19, 2018 email is attached hereto as **EXHIBIT C**.

9.      On March 15, 2019, Margolis emailed HTH's creditors to provide "an update on

[HTH'] operations and financing plan."   (Operations that, according to Margolis recent

declaration, HTH never had.)  Margolis again assured HTH's creditors that "[t]he planned merger

of PersonalRX and BenAdvance is on track."  A copy of the March 15, 2019 email is attached

hereto as **EXHIBIT D**.

10.     Given the overlapping ownership interests of Margolis and Milone in HTH,

PersonalRX, and BenAdvance, I and HTH's other creditors had no reason to doubt that the

contemplated transactions would occur – and no warnings as to the risks and consequences if the

contemplated transactions failed to occur.

11.     HTH sold notes to investors pursuant to certain Convertible Promissory Note

Purchase Agreements (the "Note Purchase Agreements").  Upon information and belief, the Note

Purchase Agreements provided that "[t]he Company [HTH] shall use the proceeds from the

issuance and sale of the Notes for working capital and other general corporate purposes."

Notwithstanding the terms of the Note Purchase Agreements, HTH did not use the loan proceeds

for its working capital or its corporate purposes.  Rather, Margolis and Milone caused HTH to use

100% of the loan proceeds to finance Margolis' and Milone's other businesses: PersonalRX and

4

BenAdvance. Margolis and Milone advised investors that such "bridge financing" by HTH to PersonalRX and BenAdvance was necessary to consummate HTH's acquisition of those entities. As a result, the approximately $10 million of loans that HTH received from investors were redirected by HTH as loans to PersonalRX and BenAdvance. As Margolis admits in his Declaration, HTH extended two loans to PersonalRX and BenAdvance with balances due of approximately $7,654,571 and $2,256,336, respectively. (Margolis Decl. ¶ 44.) According to Margolis, these loans were documented by notes between it and PersonalRX and BenAdvance. (*Id.*) Upon information and belief, Margolis and Milone caused HTH to loan the funds obtained from HTH's investors to PersonalRX and BenAdvance through unsecured promissory notes, due upon demand by HTH, with interest at the rate of 3% per annum (an interest rate that was lower than the interest rate payable by HTH to its creditors). Most troubling, HTH loaned these funds to PersonalRX and BenAdvance without any contractual commitment by PersonalRX or BenAdvance to consummate the transactions for which the loans were being made.

12.    Margolis' and Milone's use of this loan scheme resulted in HTH's creditors having claims against HTH, and HTH having claims against PersonalRX and BenAdvance – but effectively insulated PersonalRX and BenAdvance from any direct claims by HTH's creditors for payment of their notes. Having never transferred any assets to HTH, and lacking any contractual commitment to do so, Margolis and Milone have left HTH's creditors with claims against a shell company. As a result, HTH's creditors' ability to recover on the notes issued by HTH is dependent upon PersonalRX and BenAdvance performing their obligations to HTH, and PersonalRX and BenAdvance have no obligation to perform unless and until HTH demands payment from them. HTH's creditors' ability to recover on the notes issued HTH is ultimately dependent upon HTH

5

demanding and enforcing payment of PersonalRX's and BenAdvance's obligations to HTH. HTH's creditors presently having no legal right to enforce such performance and Margolis and Milone are in the conflicted position of having to cause HTH to enforce its remedies against PersonalRX and BenAdvance (which purportedly do not have the ability to repay the amounts owed to HTH).

### C.    Misrepresentations and Omissions Regarding HTH's Acquisition of PersonalRX and BenAdvance

13.    In order to induce me and HTH's other creditors to loan money to HTH, Margolis and Milone made numerous representations that HTH had either acquired or would acquire the business operations of PersonalRX and BenAdvance and omitted any disclosure of the risks or consequences arising from the failure of that acquisition to occur.

14.    In support of their representations to me and HTH's other creditors, Margolis and Milone produced a "Health Tech Harbor, Inc. Merger Memorandum of Understanding" between PersonalRX and BenAdvance dated November 3, 2017 (the "2017 MOU").  A copy of the 2017 MOU is attached hereto **EXHIBIT E**.  The 2017 MOU provided that HTH "will purchase the assets and/or stock of [BenAdvance] and [PersonalRX]."  According to the 2017 MOU, "[u]pon closing of the REG A+ financing, the shareholders of both [BenAdvance] and [PersonalRX] shall swap stock in their entities for HTH stock."  Post-closing, BenAdvance was to "operate as a wholly owned subsidiary of HTH," and the assets of PersonalRX were to be purchased by a new wholly owned subsidiary of HTH to be called "PersonalRX, Inc."  The last paragraph of the 2017 MOU provides that "HTH legal counsel will provide the required documentation making the terms and

6

conditions of this MOU legally binding." Upon information and belief, Margolis and Milone never

caused the 2017 MOU to become legally binding on PersonalRX or BenAdvance.

16.    It was around this time in 2017, that Margolis and Milone asked me to serve as one

of HTH's directors after the merger. In the spring of 2018, however, I declined the offer.

16.    Originally, HTH represented that it would launch the REG A+ financing in early

2018. However, after obtaining millions of dollars of loans through HTH's creditors, PersonalRX

and BenAdvance decided not to proceed with the REG A+ financing contemplated by the 2017

MOU. (According to the December 19, 2018 email attached hereto as Exhibit C, after the initial

paperwork REG A+ financing had been filed with the SEC, "Maxim's excitement in bringing

[HTH] to market cooled, for several reasons, among them being the lack of performance by RegA+

equities, and partly due to Maxim's lack of confidence in the RegA+ process.") Instead, on March

15, 2019, PersonalRX and BenAdvance entered into an Addendum to the 2017 MOU (the "March

2019 MOU") which replaced the reference to "REG A+ financing" in the 2017 MOU to "a single

Private Placement amounting to $5 million or more." A copy of the March 2019 MOU is attached

hereto as **EXHIBIT F**. The March 2019 MOU further provided that "[i]n 2019 to date we have

raised $1 million in bridge funding. We are now seeking an additional $1 million in the bridge,

followed by a $3 million private placement. Once $1 million of this private placement is received,

we will effectuate the merger." The March 2019 MOU also amended the last paragraph of the

2017 MOU to read as follows: "HTH legal counsel in conjunction with counsel of both

[BenAdvance] and [PersonalRX] will provide the required documentation making the terms and

conditions of this MOU legally binding…." Again, upon information and belief, Margolis and

7

Milone never caused the March 2019 MOU to become legally binding on PersonalRX or BenAdvance.

17.    Upon information and belief, HTH subsequently raised the $1 million private placement that was supposed to trigger the effectuation of the merger pursuant to the terms of the March 2019 MOU.  However, despite meeting the $1 million private placement requirement, PersonalRX and BenAdvance still did not effectuate the merger.

18.    By late 2019, PersonalRX and BenAdvance were in need of additional "bridge financing" to purportedly consummate the merger transaction with HTH.  In order to induce investors to make further loans to HTH, PersonalRX and BenAdvance entered into a Memorandum of Understanding dated December 24, 2019 (the "December 2019 MOU").  (The December 2019 MOU contains a confidentiality provision.  HTH's creditors are not parties to the December 2019 MOU, and the confidentiality provision – as well as the arbitration provision – is not binding on them.  Although the confidentiality provision is not binding on HTH's creditors, the Petitioning Creditors have elected not to submit a copy of the December 2019 MOU so as to avoid any sideshow disputes.)  The stated purpose of the December 2019 MOU was "to set forth certain binding agreements with respect to…the contemplated and negotiated merger of [PersonalRX] and [BenAdvance] such that the surviving entity shall be a wholly-owned subsidiary of [HTH]…."  Pursuant to the December 2019 MOU, HTH, PersonalRX, and BenAdvance agreed that if HTH raised at least $1.5 million by March 9, 2020, then "the merger closing will be scheduled and consummated on or before March 31, 2020."  Again, HTH raised the $1.5 million required to consummate HTH's acquisition of PersonalRX and BenAdvance under the December 2019 MOU, and, again, PersonalRX and BenAdvance failed to consummate the transaction.

ME1 34195190v.2

### D.    Margolis' Termination of the Merger Transaction and Dissipation of Assets

19.    On May 31, 2020, contrary to the numerous representations and assurances made to HTH's creditors over 2 ½ years, and despite HTH obtaining approximately $10 million of loans to consummate the transaction, Margolis informed HTH's creditors that PersonalRX was withdrawing from all negotiations and terminating the merger transaction.  Upon information and belief, Margolis refused to proceed with the merger transaction because he would not have had a controlling interest HTH or PersonalRX after the merger transaction.  BenAdvance subsequently advised HTH's creditors that it also would not proceed with the merger transaction.

20.    In his Declaration, Margolis alleges that prior to his termination of the merger, I threatened to "get rid of" him and sue him and PersonalRX for "fraudulent representation and securities fraud."  (Margolis Decl. ¶¶ 29 and 30.)  To the contrary, I merely informed him that I would retain a lawyer to protect my rights because he had refused to provide us with financial information regarding HTH that we had repeatedly requested as he prolonged the merger process.  Nevertheless, I do believe that fraudulent representations were made, and I question whether securities laws were violated.

21.    Indeed, upon information and belief, at some time prior to July 1, 2020, Margolis caused a new entity to be formed named PRX Ventures, Inc. ("PRX Ventures").  Upon information and belief, Margolis transferred his ownership interest in PersonalRX (the business that was to be acquired by HTH) to PRX Ventures.  On July 1, 2020, Margolis offered HTH's creditors the option to convert a portion of the debt owed to them by HTH to an equity interest in PRX Ventures, provided that HTH's creditors agreed to "release PersonalRX, HTH and their respective directors and officers [i.e., Margolis] of any liability relating to the merger, the loans and the Notes."

9

Margolis further indicated that "[o]ther debts assumed or paid by [PRX Ventures] will offset [PersonalRX's] loan balance to HTH." A copy of Margolis' proposal is attached hereto as **EXHIBIT G**.

       **E.**    **The Petitioning Creditors Seek Payment of Their Notes**

22.     As set forth above, I am the holder of the Catino Note. I purchased the Catino Note pursuant to a Convertible Promissory Note Purchase Agreement dated November 28, 2017.

23.     The Catino Note and other notes I hold are presently due and payable in full. A demand for the immediate payment of the Catino Note was made on July 24, 2020. To date, HTH has failed to pay the amounts due under the Catino Note and other notes.

24.     I have been notified by PersonalRX and BenAdvance that the proposed merger transaction has been terminated. To my knowledge, Margolis/HTH/PersonalRX and Milone/BenAdvance are not engaged in any discussions regarding the terminated merger. Having duped me and HTH's other creditors into loaning HTH millions of dollars to consummate the merger transaction, Margolis now argues that I and HTH's other creditors are acting in "bad faith" because we want to be paid the amounts we loaned to HTH. To be clear, I and the other Petitioning Creditors are not trying to "salvage" the now-dead merger transaction or gain some type of advantage in non-existent negotiations. I and the other Petitioning Creditors want to be paid the amounts owed to us by HTH and believe that the bankruptcy process will maximize our ability to recover on our claims. To that end, I and the other Petitioning Creditors filed the Involuntary Petition and seek appointment of a chapter 7 trustee for the following reasons:

- to obtain full disclosure of HTH's assets;

ME1 34195190v.2

- to investigate and, if appropriate, prosecute claims that the bankruptcy estate may have against third parties, including, without limitation, claims for breach of contract, breach of fiduciary duty, securities laws violations, and fraud;

- to avoid and recover any fraudulent and/or preferential transfers;

- to demand and, if necessary, enforce payment of PersonalRX's and BenAdvance's note obligations to HTH;

- to stay Margolis/PersonalRX and Milone/BenAdvance from setting off any amounts owed to HTH and to prevent Margolis/PersonalRX and Milone/BenAdvance from converting PersonalRX's and BenAdvances's current debt obligations to HTH to long term debt or equity; and

- to ensure the orderly and equal distribution of any recoveries among HTH's creditors.

25.    For the foregoing reasons, I respectfully request that the Court deny HTH's Motion and promptly enter an order for relief.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 15, 2020

_____
Annette Catino

11

# EXHIBIT A

THIS NOTE, AND THE SECURITIES ISSUABLE UPON CONVERSION OF THIS NOTE, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR THE APPLICABLE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE PLEDGED, SOLD, ASSIGNED OR OTHERWISE TRANSFERRED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION UNDER SUCH LAWS OR AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENT.  INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER, TO THE EFFECT THAT SUCH PLEDGE, SALE, ASSIGNMENT OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND ALL APPLICABLE STATE SECURITIES LAWS.

No. CPN-2017-1

# HEALTH TECH HARBOR, INC.

## Convertible Promissory Note

$150,000.00                                                          November 28, 2017

For value received, Health Tech Harbor, Inc. (the "**Company**"), hereby promises to pay to the order of Annette Catino (hereinafter together with his, her or its successors in title and assigns referred to as the "**Holder**"), on demand by the Requisite Holders (as defined below) on or after December 31, 2018 (the "**Maturity Date**"), the principal sum of One Hundred Fifty Thousand Dollars ($150,000.00), together with interest thereon as set forth below (the "**Amount Due**"), unless earlier repaid or converted pursuant to the terms and conditions set forth below.

This Convertible Promissory Note (this "**Note**") is one in a series of convertible promissory notes (collectively, the "**Notes**") issued by the Company pursuant to that certain Convertible Promissory Note Purchase Agreement, dated as of November 28, 2017, by and among the Company and the parties thereto (the "**Purchase Agreement**"). As used in this and any other Notes, "**Requisite Holders**" shall mean the holders of a majority of the aggregate outstanding principal amount of this and such other Notes.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

1.      Interest. This Note shall bear simple interest at an annual rate of five percent (5%). Interest shall be computed on the basis of a 365-day year for the actual number of days elapsed but in no event shall the rate of interest exceed the maximum rate, if any, allowable under applicable law. Interest shall accrue and not be payable until converted as provided in Section 3 hereof or paid in connection with repayment in full of the principal amount of this Note.

2.      Amount Due.

2.1      Payments. Payment of principal and interest shall be made in immediately available funds in lawful currency of the United States of America at the offices of the Holder or

1

2.   Amount Due.

2.1   Payments. Payment of principal and interest shall be made in immediately available funds in lawful currency of the United States of America at the offices of the Holder or at such other place as the Holder hereof shall have designated to the Company in writing. Payment shall be credited first to any costs, expenses or charges then payable to the Holder, then to accrued interest then due and payable, and then to principal.

2.2   Notes Pari Passu. Each of the Notes shall rank equally without preference or priority of any kind over one another, and all payments and recoveries payable on account of principal and interest on the Notes shall be paid and applied ratably and proportionately on the Amount Due on all outstanding Notes on the basis of their original principal amount.

2.3   Prepayment. This Note may not be prepaid without the written consent of the Requisite Holders. Any such approved prepayment must be made in accordance with Section 2.2 above.

3.   Conversion of the Notes.

3.1   Definitions. The Note shall be convertible according to the following terms:

"**Affiliate**" means, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, or is controlled by, or is under common control with such specified Person. For purposes of this definition, "control," "controlled by" and "under common control with" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Capped Conversion Price**" shall be calculated by dividing $25,000,000 by the fully diluted capitalization of the Company immediately prior to the conversion of the Notes (based on the total number of shares of common stock of the Company then outstanding, assuming the conversion of all outstanding options, warrants and other convertible securities, other than the Notes, and, in the case of a Qualified Financing, expressly excluding any shares reserved or authorized for future issuance under the Company's equity incentive plans as of immediately following the Qualified Financing).

"**Change of Control**" means the merger or consolidation of the Company into or with another Company (other than a wholly-owned subsidiary of the Company in a merger in which the Company is the surviving Company and the Certificate of Incorporation remains unchanged), the sale, lease, exclusive license, transfer or other disposition of all or substantially all of the assets or intellectual property of the Company (other than to a wholly-owned subsidiary of the Company), a transfer of more than fifty percent (50%) of the voting power of the Company, in a single transaction or series of related transactions and the closing of the initial public offering of the Company's Common Stock; provided, that a Qualified Financing or other equity financing shall not constitute a "Change of Control".

B-2

"**Common Stock**" means the common stock, par value $0.0001 per share, of the Company.

"**Conversion Stock**" means Common Stock or Preferred Stock, as applicable, sold by the Company at the Qualified Financing; provided, that in the event of the sale of Preferred Stock at the Qualified Financing, the Company may issue to the Holder a shadow series of preferred stock having identical rights, privileges, preferences and restrictions as the Preferred Stock, other than with respect to the following terms: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price (as defined below); and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Equity Securities**" means the Common Stock or Preferred Stock, as applicable, issued upon conversion of the Note under this Section 3.

"**Qualified Financing**" means (i) the first bona fide sale (or series of related sales) by the Company of its Common Stock or Preferred Stock after the date of the Purchase Agreement resulting in aggregate proceeds to the Company (excluding the Notes) of at least $5,000,000; or (ii) sale (or series of related sales) by the Company of its Common Stock or Preferred Stock after the date of the Purchase Agreement approved by the Company and the Requisite Holders.

"**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

"**Preferred Stock**" means the preferred stock, par value $0.0001 per share, of the Company (or any similar equity security to be issued in connection with the Qualified Financing) to be authorized immediately prior to the closing of the Qualified Financing.

3.2   Financing Conversion.

    i.    Upon a Qualified Financing, in full satisfaction of the Company's obligations under this Note, the Company will, at the Holder's election, (a) (1) pay the Holder an amount equal to the principal then outstanding under this Note plus the amount of accrued interest then outstanding under this Note immediately prior to the closing of such Qualified Financing and (2) issue to the Holder a warrant (the "**Warrant**") to purchase shares of Conversion Stock; or (b) convert this Note into shares of the applicable Conversion Stock issued in the Qualified Financing. The Company shall provide the Holder with written notice (the "**Company Notice**") of the Qualified Financing at least ten (10) days prior to the closing of such Qualified Financing. The Holder shall provide the Company with written notice (the "**Holder Notice**") of its election pursuant to this subsection (i) within five (5) days of receipt of the Company Notice. In the event that the Holder does not provide the Holder Notice as required herein, this Note shall convert pursuant to subsection (b) above.

ii.   The number of shares of Conversion Stock that may be purchased under the Warrant shall be equal to the quotient obtained by dividing (a) fifteen percent (15%) of the principal then outstanding under this Note by (b) the per share price of the Common Stock or Preferred Stock sold in the Qualified Financing. The Warrant shall be exercisable for five (5) years from the closing of the Qualified Financing and shall have a strike price equal to one hundred twenty-five percent (125%) of the per share price of the Common Stock or Preferred Stock sold in the Qualified Financing. The Holder hereby agrees, as a condition to the issuance of the Warrant, to execute a Warrant in substantially the form set forth as <u>Annex I</u> attached hereto.

iii.   The number of shares of Conversion Stock to be issued upon such conversion shall be equal to the quotient obtained by dividing (1) the Amount Due on the date of conversion by (2) the lesser of (x) eighty percent (80%) of the per share price of the Common Stock or Preferred Stock sold in the Qualified Financing and (y) Capped Conversion Price (the lower of subsection (x) and (y), the "**Conversion Price**").  The Holder hereby agrees, as a condition to such conversion, to execute and become party to all agreements that the Company reasonably requests in connection with such Qualified Financing.

3.3   <u>Change of Control</u>. In the event of a Change of Control of the Company, at the closing of such Change of Control, in full satisfaction of the Company's obligations under this Note, the Company will, at the Holder's election, (i) pay the Holder an amount equal to (A) two (2) times the principal then outstanding under this Note plus (B) the amount of accrued interest then outstanding under this Note immediately prior to the closing of such Change of Control or (ii) convert this Note into shares of Common Stock. The number of shares of Common Stock to be issued upon such conversion shall be equal to the quotient obtained by dividing (x) the Amount Due on the date of such Change of Control by the (y) Capped Conversion Price, and rounding down to the nearest whole number of shares.

3.4   <u>Fractional Shares</u>. No fractional shares of any of the Company's equity securities will be issued in connection with any conversion of this Note.

3.5   <u>Certificate</u>. As promptly as practicable after the conversion of this Note, the Company at its expense will issue and deliver to the Holder, upon surrender of the Note, a certificate or certificates for the number of full shares of Equity Securities issuable upon such conversion.

4.   <u>Demand; Default</u>. This Note shall, at the election of the Requisite Holders, become immediately due and payable, upon notice and demand by the Requisite Holders (except in the case of clauses (a) and (b) below, which shall not require notice or demand), upon the occurrence of any of the following events of default (individually, an "**Event of Default**" and collectively, "**Events of Default**"):

(a)   the liquidation, dissolution or insolvency of the Company, or the appointment of a receiver or custodian for the Company of all or substantially all of its property, if

B-4

such appointment is not terminated or dismissed within thirty (30) days; or

(b)      the institution by or against the Company of any proceedings under the United States Bankruptcy Code or any other federal or state bankruptcy, reorganization, receivership, insolvency or other similar law affecting the rights of creditors generally.

Upon the occurrence of an Event of Default, the Holder shall have then, or at any time thereafter, all of the rights and remedies afforded by the Uniform Commercial Code as from time to time in effect in the State of New York or afforded by other applicable law.

5.      No Set-Off. All payments by the Company under this Note shall be made without set-off or counterclaim and be without any deduction or withholding for any taxes or fees of any nature, unless the obligation to make such deduction or withholding is imposed by law.

6.      General.

6.1      Transfers; Successors and Assigns.

(i)      This Note, and the obligations and rights of the parties hereunder, shall be binding upon and inure to the benefit of the Company, the holder of this Note, and their respective heirs, successors and assigns; provided, however, that the Company may not transfer or assign its obligations hereunder, by operation of law or otherwise, without the consent of the Requisite Holders; and provided further that the Holder may not transfer or assign its rights hereunder, by operation of law of otherwise, except to an Affiliate, without the consent of the Company.

(ii)      Notwithstanding anything else in this Note to the contrary, the right of any Holder (or transferee) to receive principal or interest payments under this Note may be transferred only through the surrender of the current Note and reissuance of a new note by the Company pursuant to the provisions of this paragraph. The foregoing language is intended to cause the Note to be in "registered form" as defined in Treasury Regulations Sections 5f.103-1(c) and 1.871-14(c) and shall be interpreted and applied consistently therewith.

6.2      No Rights or Liabilities as Stockholder; No Personal Liability. This Note does not by itself entitle the Holder to any voting rights or other rights as a stockholder of the Company. In the absence of conversion of this Note, no provisions of this Note, and no enumeration herein of the rights or privileges of the Holder, shall cause the Holder to be a stockholder of the Company for any purpose. Holder agrees that no stockholder, director or officer of the Company shall have any personal liability for the repayment of this Note.

6.3      Amendment. This Note may be amended or modified, or compliance with any term, covenant, agreement, condition or provision set forth herein may be omitted or waived, either generally or in a particular instance and either retroactively or prospectively, upon written consent of the Company and the Requisite Holders; provided, however, that no such change, addition, omission or waiver shall reduce the principal on this Note without the consent of the Holder thereof.

B-5

6.4    Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on their signature pages to the Purchase Agreement, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Section 6.4. If notice is given to the Company, a copy shall also be sent to Goodwin Procter LLP, 620 Eighth Avenue, New York, New York 10018, Attn: Stephen M. Davis, Esq., which copy shall not constitute notice.

6.5    Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.6    Governing Law. This Note and the obligations of the Company hereunder shall be governed by and interpreted and determined in accordance with, the laws of the General Corporation Law of the State of Delaware as to matters within the scope thereof, and as to all other matters shall be governed by, and construed in accordance with, the internal laws of the State of New York (excluding the laws and rules of law applicable to conflicts or choice of law).

**[Signature on following page]**

IN WITNESS WHEREOF, this Note has been duly executed on behalf of the undersigned on the day and in the year first written above.

Health Tech Harbor, Inc.

By: _____

Name: _____

Title: _____

[Signature Page to Convertible Promissory Note]

B-7

# EXHIBIT B



# Health Tech Harbor Engages Maxim Group LLC For Investment Banking Services

*Health Technology Portfolio Company Recruits Leading Investment Banking, Securities, and Investment Management Firm*

NEW YORK (PRWEB) November 21, 2017 -- Health Tech Harbor Inc., a holding company for health technology entities aligned by common goals and synergies, announced today that it has selected Maxim Group LLC, a full-service investment banking, securities, and investment management firm, to provide strategic planning, investment banking and securities services for an upcoming Reg A+ public offering.

Health Tech Harbor emerged from an alliance between two national health technology companies - PersonalRX and BenAdvance. PersonalRX is a pharmacy technology company that employs robotics and pharmacist oversight to dispense a patient's medications pre-sorted and packaged by dose. The company's focus is to help reduce medication errors, especially for the 39 million Americans who take five or more medications daily. BenAdvance is a marketing and technology company with first mover status in the surging supplemental and voluntary benefits marketplace. BenAdvance web-based technology streamlines the buying process and empowers insurance brokers to offer 40 supplemental benefits aggregated from 15 blue chip carriers.

As the first two companies in Health Tech Harbor, PersonalRX and Benadvance work independently as well as together, gaining efficiencies from shared resources and relationships, and identifying health tech acquisition targets well-suited to fuel growth and profitability for all companies within Health Tech Harbor.

Maxim Group will support Health Tech Harbor's financial growth and expansion of its footprint within the marketplace. Through strategic consultation and harnessing the power of the new Reg A+ platform, Maxim will aid Health Tech Harbor with the resources required to acquire the companies, technology and talent needed to attain ambitious growth targets.

"Maxim Group is a highly respected financial firm for a good reason. Their insight, encouragement and wisdom has proved invaluable already, and we're just getting started," says Lawrence Margolis, CEO of PersonalRX and CEO of Health Tech Harbor.

Of the engagement with Maxim Group, BenAdvance CEO Anthony V. Milone states, "BenAdvance is leveraging our longstanding relationships and state of the art technology platform to introduce PersonalRX to customers who will benefit from enhanced health services. Likewise, our company gains access to revenue-generating opportunities as well."

Cliff Teller, Executive Managing Director & Head of Investment Banking of Maxim Group, commented that "We are delighted to advise Health Tech Harbor. We look forward to working closely with HTH management and are excited to have HTH be part of our new REG A+ platform, which facilitates emerging growth companies access to the U.S. markets."

For more information about Health Tech Harbor companies PersonalRX and BenAdvance, visit PersonalRX.com and BenAdvance.com.

ABOUT MAXIM GROUP LLC



Maxim Group LLC is a leading full service banking, securities and wealth management firm headquartered in New York. The firm provides a full array of financial services including investment banking, private wealth management; and global institutional equity, fixed income and derivative sales and trading, equity research and prime brokerage services to a diverse range of corporate clients, institutional investors and high net worth individuals, Maxim Group is a registered broker-dealer with the U.S. Securities and Exchange Commission and Municipal Securities Rulemaking Board (MSRB), and is a member of the following: Financial Industry Regulatory Authority (FINRA). Securities Insurance Protection Corporation (SIPC), NASDAQ Stock market and NYSE Arca, Inc. To learn more about Maxim Group, visit maximgrp.com.

ABOUT HEALTH TECH HARBOR INC
Health Tech Harbor Inc. is a portfolio of health technology companies that share a common goal: to participate in scalable opportunities that improve the U.S. healthcare system. Each portfolio company offers a solution that merits investor excitement on its own. Together, Health Tech Harbor companies contribute and benefit from shared resources, cross-marketing and cross-selling – accelerating growth and profitability for individual companies and The Harbor. Two emerging health tech companies, PersonalRX and BenAdvance are first in Health Tech Harbor. Visit HTHarbor.com.

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Our complete disclaimer appears here - PRWeb ebooks - Another online visibility tool from PRWeb*



**Contact Information**
**Keith Gallant**
Health Tech Harbor
http://https://www.htharbor.com/
+1 201-399-3700 Ext: 1018

**Online Web 2.0 Version**
You can read the online version of this press release here.

*If you have any questions regarding information in these press releases please contact the company listed in the press release. Our complete disclaimer appears here - PRWeb ebooks - Another online visibility tool from PRWeb*

# EXHIBIT C

**Subject:**                          FW: HTH Investor Update - December 2018

**From:** Lawrence Margolis <lmargolis@htharbor.com>
**Date:** Wednesday, December 19, 2018 at 10:17 AM
**To:** Lawrence Margolis <larry@htharbor.com>
**Subject:** HTH Investor Update - December 2018

Dear Health Tech Harbor Investor,

It's been a very busy year for HTEK. We are quite pleased with our performance and progress to date, and accordingly, I wanted to provide you with an update. I've attached a copy of the most recent investor letter by Anthony Milone to all BEN shareholders. As you know, HTEK is committed to completing the merger among BEN, PRX into the HTEK holding company, for which you are an investor.

Most of the interim financing we have received for HTEK has been at the $25mm valuation level. I am pleased to report that, since October, we are receiving additional investments at a $50mm valuation.

We are also entertaining conversations with strategic partners/investors. We find this especially exciting because these parties may bring to us, not only substantial institutional funding, but an acceleration of our growth trajectory. We look forward to advancing these discussions and will keep you apprised of our progress.

In the meantime, we continue to raise needed interim capital ahead of a larger transaction, and allows us to continue to create value through our increasing run rate. Should you have an interest in adding to your position, your investment will enjoy preference over any institutional round that we expect to take place.

If you have any further questions, please let me know.

Happy holidays and all the best to you and family. We look forward to further success in 2019 and beyond, and we are pleased to have you as part of Company family.

Sincerely,

Lawrence Margolis, CEO
Health Tech Harbor, Inc.

***********************

[LETTER TO BENADVANCE INVESTORS, DECEMBER 6, 2018]

It has been some months since we provided the investors in HAN Benefit Advantage (dba BenAdvance ("BEN") since mid-2018) with an update on our business progress, as well as our larger corporate opportunities.

As we have described in detail in previous investor letters distributed to you in December 2017 and again in May 2018, we embarked on a merger with PersonalRX ("PRX"), the pharmacy distribution business based in a new location in East Rutherford, NJ, to take advantage of revenue and operating synergies, as well as to participate in a larger financing process that a merger of two entities presents.  Consequently, this summer we

1

moved BenAdvance Sales and Distribution to East Rutherford, New Jersey to take advantage of combined call center and administrative processes. We are growing and already working together!

As previously described, we set up a holding company, Health Tech Harbor ("HTEK"), to hold the two companies and their merged assets upon completion of an institutional fundraise, targeted as a single investment of $5mm or more. The merger memorandum of understanding we have agreed to calls for 60% of the equity in the combined entity to go to holders of PRX equity, and 40% to BEN investors, less a modest amount of dilution for investment banking success fees, as well as minority position dilution from institutional investment participation.

Our first view was that with scale and revenue that the merged entities afforded, we could consummate a Regulation A+ ("RegA+") initial public offering ("IPO"). This was a structure created by Title IV of the Jumpstart Our Business Startups (JOBS) Act of 2012, to streamline the approach to public securities markets by smaller companies. We hired small-company investment banker Maxim to assist in this effort, created an investor deck, reserved the NASDAQ stock symbol HTEK, embarked on an accounting audit of both entities via Marcum, hired Goodwin Procter to do all the legal work, culminating in an SEC filing in late spring, which received speedy approval by the SEC, with "no comments back" – the first time our veteran legal counsel told us that had ever happened in his career.

After the filing was completed, Maxim's excitement in bringing us to market cooled, for several reasons, among them being the lack of performance by RegA+ equities, and partly due to Maxim's lack of confidence in the RegA+ process. We regrouped in late summer, parting ways with Maxim and planning next steps.

That led us to an introduction to Stifel, a national-recognized brand name in investment banking, and its specialty financing arm, Keefe Bruyette and Woods ("KBW"), with a focus on the financial industry, as well as technology companies serving finance and healthcare businesses. After a number of in-depth meetings, we signed an agreement with KBW in September. This new approach involved our raising growth capital via a private placement, either through institutions or strategic industry partners, leading to a potential IPO or potentially being acquired, once our revenue models mature a bit.

KBW is currently in the market soliciting investment interest, and discussions are ongoing, with the expectation that we may close on the first piece of institutional funding by the first quarter of 2019.

In the meantime, the executives of BEN have been working in concert with PRX in an effort to augment bridge investment in HTEK. That effort has borne fruit, with an additional $4mm in bridge funds coming in during 2018 so far, with most of these funds coming from current BEN investors. The latest money is invested at a $50mm minimum valuation, which for BEN represents 40% of that, equating to a $20mm valuation, less some modest dilution for equity earned by advisors. This is a substantial increase from the formal valuation conducted by our auditors in early 2018, where they calculated BEN's valuation at $7.2mm. We greatly appreciate the support these investors have given to our broader-scope plans.

On the business front, PRX continues to grow at a double-digit pace, with its focus on packaging and delivering prescriptions to the 38 million+ people in the US who take five or more medications daily. PRX has established a relationship with a direct/internet marketing firm, creating some 90 leads per week, converting a substantial number to the PRX service. We believe we will hit a 60% penetration over time, as our staffing grows and is fully trained. Average annual revenue from each of these new clients is in the $5,000 range, propelling the PRX business to dramatic new growth.

The packaged medication business was propelled forcefully with news this summer that Amazon was to acquire PillPack, a $100mm revenue business at the time, for more than $1 billion. Suddenly on all fronts – consumers, potential business partners as well as investors – have stood up and taken notice of what PRX was doing.

At the same time BEN continues to validate and grow its business model in the benefits arena. While the massive contracts with BenefitMall and EmblemHealth are still in the pilot stage, BEN is actively signing up brokers on its own, with 50 added since September, making a total of 132 being served today.

In what was a watershed event, in November BEN inked a contract for ownership of 75% of the supplemental benefits technology platform on which the business depends. In the future we will be exploring new avenues of growth, such as technology licensing to non-competitors. In addition, BEN has invested time and effort in developing a contractual relationship with CWI Administrators to offer Chubb's suite of supplemental products. BEN also established another complementary line of business – the level funded health insurance business. Offered by Nationwide, BEN is a key component in the value chain, linking groups and associations tired of double-digit health insurance premiums increases, as well as ever-diminishing quality of such plans, to this new model of health insurance. In future letters we will describe our progress with these new business concepts.

Regardless of the direction of our institutional financing, we will complete our merger with PRX and formalize the HTEK company in the next few months, and will continue working together on new business initiatives. With assistance from our corporate counsel Goodwin Procter, we will be in touch about the process of converting your BEN notes and equity into HTEK investments. We believe we are making the right decisions to benefit all the shareholders.

Please let me know by phone or email if I can be of assistance in answering any questions or comments you may have.

We hope you and your family have a blessed holiday season.

Sincerely,

Anthony V. Milone, CEO
HAN Benefit Advantage Inc. dba BenAdvance

# EXHIBIT D

**Subject:**                    FW: HTEK INVESTOR UPDATE 3-15-19

**From:** Lawrence Margolis <lmargolis@htharbor.com>
**Date:** Friday, March 15, 2019 at 8:02 AM
**To:** Lawrence Margolis <larry@htharbor.com>
**Subject:** HTEK INVESTOR UPDATE 3-15-19

**COMPANY CONFIDENTIAL - NOT FOR DISTRIBUTION**

March 15, 2019

Dear Health Tech Harbor Investor:

We are pleased to provide you with an update on HTEK's operations and financing plans.

As an overview, 2018 was a year focused on building infrastructure, logistics planning, hiring sales staff and nurturing relationships.  In 2019 we have begun the harvest.  We are excited to move our plans forward and are proud of our staff and leadership team for working so hard. Attached to this email is a recap of the PersonalRX and BenAdvance businesses and pipeline, as well as a draft of the 2018 financials and 2019-2020 projections for review.

The planned merger of PersonalRX and BenAdvance is on track. We executed a revised Memorandum of Understanding between the two entities, attached to this letter, re-confirming our merger plans and updating the trigger from a public offering to the front end of a private placement of $3MM. We are eager to complete the merger as soon as possible with the capital raise. It is important to note that the regulatory costs of a change in ownership of PRX, are in excess of $110,000.  In light of these steep costs, we plan to execute the merger after the $3MM financing is in place.

We are working closely with our bankers Keefe Bruyette and Woods who continue to make important introductions, both strategic and financial. As described in our December 2018 Investor Letter, our target raise of $5MM remains constant.  To date, we have raised $1MM of the $5MM,  looking forward to another $1MM interim bridge shortly, and finally, a raise of $3MM to complete our financing needs by year's end.

Given the pipeline described for PersonalRX and BenAdvance following this letter, we face a "good" issue.  As we establish relationships, it has become apparent that our infrastructure and staff need to stay well ahead of the business flowing from these new clients.  Our projections anticipate these costs and it is imperative that we continue to bolster infrastructure to meet this increasing demand. To that end, we are seeking $1MM in bridge funding from our current investors as part of the total $5MM financing for 2019. This bridge funding permits us to build scale as we negotiate favorable terms with interested strategic investors.

Our projections attached reflect the move to profitability in Q4 2019. This combined bridge and strategic raise should be the last investment needed before becoming cash flow positive.

Accordingly, we are pricing the current convertible bridge round accordingly: interest of 5%, convertible to common stock at a 20% discount to post-2019 rounds at a maximum conversion level of $35MM. We will also be revising the paperwork for all investments made at the $50MM conversion level to this $35MM level. We feel that these terms, along with the progress we have made with the business, make HTEK an ever more compelling investment. **We ask for your participation in this current bridge round now to allow us to continue our progress in building out these exciting initiatives.**

The allotment for current investors will have a rolling close ending on April 10, 2019 and will be filled on a first come basis. Please let us know of your interest and we will send you the follow-on investment paperwork. If we are over-subscribed we may allow for some additional allotment to our current investors, though we want to keep open the $3MM raise for outside strategic investors, large enough for these investors to be interested.

As always, if we can answer any questions you may have about HTEK, please reach out.

Many thanks from the entire HTEK family for your continued support. Please read below for details on Company operations.

Regards,
Larry-

# EXHIBIT E

**Health Tech Harbor, Inc.**
Merger Memorandum of Understanding ("MOU")

November 3, 2017

Health Tech Harbor, Inc. ("HTH"), a Delaware Corporation, will purchase the assets and/or stock of HAN Benefit Advantage Inc. dba BenAdvance ("BEN") and DGN Pharmacy, Inc. ("DGN") dba PersonalRX ("PRX").

The transaction will take place upon the closing of the REG A+ financing. HTH and its executives have negotiated with Maxim Group, a FINRA registered broker/dealer, a placement agreement for a REG A+ registration and initial public offering ("IPO"). Maxim Group also has been retained to introduce qualified investors to HTH for interim/bridge financing, raised in the November/December 2017 timeframe.

HTH will launch the REG A+ offering in early January 2018 with a goal to complete the offering not later than end Q1-2018.

Upon closing of the REG A+ financing, the shareholders of both BEN and PRX shall swap stock in their entities for HTH stock. HTH stock will be issued back to each shareholder at a prearranged ratio of 40% for BEN holders and 60% for PRX holders.

BEN will operate as a wholly-owned subsidiary of HTH. Management anticipates retaining the separate legal entity for BEN post-close. Current BEN executive management will operate the BEN subsidiary and shall execute employee agreements as approved by HTH.

For the pharmacy acquisition, HTH will form a new wholly-owned subsidiary to house all current and future pharmacy assets. This entity will be called PersonalRX, Inc. (PRX). PRX will purchase the assets of DGN Pharmacy, Inc. and operate the pharmacy during the transfer of licenses through a "Transition Agreement". The stock transfer will be complete once the licenses approved. See "Transition Agreement" below. Current DGN executive management will operate the new PRX subsidiary and shall execute employee agreements as approved by HTH.

Prior to the closing of the merger, as required by REG A+ filings, HTH will formalize the management structure for the holding company. The board will be comprised of seven members - three chosen by BEN, three chosen by DGN and one neutral member voted on by the other six members. The HTH board will form a Compensation Committee to assist with all executive compensation issues (employment agreements, compensation plans and equity ownership/option agreements.)

HTH legal counsel will provide the required documentation making the terms and conditions of this MOU legally binding.

*[Signature page follows]*

Agreed:

**DGN Pharmacy Inc,** a New Jersey corporation, dba "**PersonalRX**"

By: _____

      Name:  Lawrence H .Margolis

      Title:  CEO

      Date:  11/3/17

**HAN BENEFIT ADVANTAGE, INC.,** a New York corporation dba "**BenAdvance**"

By: _____

      Name:  Anthony Milone

      Title:  CEO

      Date:  11/3/17

# EXHIBIT F

# MARCH 15, 2019 ADDENDUM TO HEALTH TECH HARBOR, INC. MEMORANDUM OF UNDERSTANDING ("MOU") DATED NOVEMBER 3, 2017

(Original MOU Attached as Exhibit A.)

Changes to the original are agreed as follows:

1. Replace reference to "REG A+ financing" in paragraph 2 with "a single Private Placement amounting to $5 million or more", subsequently referred to as the "Private Placement.""

2. Replace reference to "REG A+ offering" in paragraph 3, "Reg A+ financing" in paragraph 4 and "REG A+ filings" in paragraph 7, all with "Private Placement."

3. Replace the last two sentences of paragraph 2, all references to Maxim Group and its work, with "HTH has engaged a placement agent in connection with the proposed Placement."

4. Replace paragraph 3 with "HTH intends to complete the Placement by the end of 2019."

5. Add to the end of paragraph 4, "of the remaining stock after first issuing 5.4% of the HTH stock due to the Maxim Group and Michael Solomon." Then also add the following sentences: "The stock swap, in addition to legal closing costs, will trigger state pharmacy regulatory filings in each state that PRX operates. We estimate the total of such costs to be $300,000. In 2019 to date we have raised $1 million in bridge funding. We are now seeking an additional $1 million in the bridge, followed by a $3 million private placement. Once $1 million of this private placement is received, we will effectuate the merger."

6. In paragraph 6, remove the sentence "See Transition Agreement below" and insert the sentence "A Transition Agreement will be provided by PRX regulatory counsel prior to merger closing."

7. In paragraph 8, after "HTH legal counsel" insert the clause "in conjunction with counsel of both BEN and PRX", and add at the end of the paragraph: "A draft form of the Merger Agreement is attached as Exhibit B of this MOU. This MOU language has been tentatively approved by all counsel involved in this transaction, but is subject to final review prior to the closing."

8. Add a new paragraph 9: "Exhibit C, List of Actions to be Completed Prior to Merger Closing, is attached for further review and comment."

All other language of the original MOU is to remain the same.

Attachments:
Exhibit A – Original Merger MOU signed November 3, 2017
Exhibit B – DRAFT HTEK Merger Agreement – legal version with redline
Exhibit C – List of Actions to be Completed Prior to Merger Closing

AGREED:

_____ Date 3|15|19    _____ Date 3/15/19
Lawrence Margolis, CEO, DGN Pharmacy, Inc.    Anthony Milone, CEO, HAN Benefit Advantage, Inc.

# EXHIBIT G

## HEALTH TECH HARBOR
## TERM SHEET FOR EXCHANGE OF NOTES AND RESTRUCTURING
## PROPOSED BY DGN Pharmacy, Inc. DBA PersonalRX

Set forth below in this **Term Sheet** for discussion purposes only is a summary of proposed terms and conditions for the exchange of outstanding convertible notes of Health Tech Harbor, Inc. ("**HTH**") for stock of HTH and PRX Ventures, Inc., a Delaware corporation ("**PRXV**") (collectively, the "**Transaction**").

| | |
|---|---|
| **Purpose:** | The purpose of the proposed transaction is to provide holders of outstanding convertible debt of HTH (the "**Noteholders**") the ability to exchange their investments in HTH to: |
| | (1) an ownership stake in DGN PHARMACY, INC., d/b/a PersonalRX ("**PersonalRx**") through the exchange of outstanding convertible notes of HTH (the "**Notes**") for stock and warrants of PRXV, the holding company of PersonalRx; and |
| | (2) ownership of the outstanding equity of HTH, in order for Noteholders to negotiate directly with HAN BENEFIT ADVANTAGE, INC. ("**BEN**") for settlement of amounts due from BEN to HTH. |
| **Background:** | In 2017, PersonalRx and BEN proposed to merge to form a venture under HTH.  HTH was formed and funded in anticipation of the merger.  Larry Margolis owns 60% of the outstanding stock of HTH and is the sole director and CEO of HTH.  Tony Milone, the largest equity holder of BEN, owns 40% of HTH's outstanding stock. |
| | HTH raised approximately $9.9 million in convertible debt represented by the Notes.  Approximately $4.3M (principal amount) of the Notes have a "valuation cap" of $25 million (the "**25M Notes**") and approximately $5.6M of the Notes have a "valuation cap" of $35 million (the "**35M Notes**").  Subsequently, HTH provided loans to PersonalRx and BEN in the amounts of $7,654,571 and $2,177,942, respectively, which remain outstanding. |
| | The merger failed to close. HTH has no assets other than the receivables due from PersonalRx and BEN.   HTH has approximately $2,100,000 of outstanding unsecured debt, in addition to the Notes. |

**PRXV and PersonalRx cap structure:**

PRXV is the new holding company of PersonalRx. The following shows the current PersonalRx group structure:



*\* Incl. PersonalRx management + advisors*

**Larry=68.5          Others=31.5%**

**Restructuring Overview:**

PRXV proposes the following restructuring, designed to (a) satisfy the obligations of PersonalRx to HTH, (b) preserve Noteholders' ability to recoup their investments and participate in the growth of PersonalRx, and (c) remove Larry Margolis from the management and control of HTH and further dealings with BEN regarding the loan from HTH to BEN.

Under the proposed restructuring, the Noteholders will exchange their Notes for a pro rata share of (1) shares and warrants of PRXV corresponding to the value of the PersonalRx debt to HTH, plus (2) 100% of the stock of HTH.

The exchange and restructuring will result in the following cap structure of the PersonalRx group:



*\* Incl. PersonalRx management, advisors and incentive pool*

**Larry=50.0%          Noteholders=19%          Others=31%**

The Noteholders' percentage above includes warrants.

| | |
|---|---|
| **Releases and transfer of stock of HTH:** | Under a definitive exchange and restructuring agreement between and among PRXV, PersonalRx, HTH, the Noteholders and Larry Margolis (the **"Definitive Agreement"**), |

(1) Larry Margolis will transfer to the Noteholders pro rata 100% of the outstanding capital stock of HTH, allowing the Noteholders to direct the negotiation of the settlement of HTH's outstanding loan to BEN. The Noteholders by virtue of ownership of HTH will recover 100% of whatever proceeds or securities BEN provides in satisfaction of its loan. PersonalRx and Larry Margolis will have nothing further to do with HTH.

(2) The obligations under the Notes and the loan to PersonalRx by HTH will be satisfied in full by issuance of the PRXV shares and HTH shares to the Noteholders. The Noteholders and HTH (by the Noteholders) will release PersonalRx, HTH and their respective directors and officers of any liability relating to the merger, the loans and the Notes.

(3) Noteholder debt will convert to PRXV stock. Amounts due PRX team will be capitalized prior to the conversion, hence not diluting Noteholders. Other debts assumed or paid by PRXV will offset the PersonalRx loan balance due to HTH. .

| | |
|---|---|
| **Calculation of Shares of PRXV issued in exchange for Notes**: | Under the Definitive Agreement, shares and warrants of PRXV will be issued to the Noteholders using the following formula: |

<u>DEFINITIONS</u>

*D = Principal + Interest outstanding under each Note*

*R = Ratio of PRX Debt to Total Notes*

*PRX Debt = PersonalRx Loan Balance **net** of Assumed HTH Debt*

*PersonalRx Loan Balance = principal + interest under note payable from PersonalRx to HTH*

*Assumed HTH Debt = Amount of HTH payables to be paid or assumed by PRXV in the restructuring*

*Total Notes = Sum of D of all Notes*

*PRXV FD Shares = Total shares of PRXV issued and outstanding and reserved for issuance under the PRXV incentive plan immediately prior to closing of the Definitive Agreement*

*25M Notes Conversion Price = $21,250,000 divided by PRXV FD Shares*

*35M Notes Conversion Price = $29,750,000 divided by PRXV FD Shares*

<u>FORMULA</u>

Number of Shares of PRXV issued for **each 25M Note** will equal

   *(D x R) divided by 25M Notes Conversion Price*

Number of Shares of PRXV issued for each 35M Note will equal

   *(D x R) divided by 35M Notes Conversion Price*

Number of Warrants for PRXV stock issued for each Note will equal

*D x 15%*  and will have a <u>warrant exercise price</u> equal to

*125% of the applicable (25M or 35M) Notes Conversion Price*

*SEE ACCOMPANYING EXCEL SHEET*

**Participation Rights**: The Definitive Agreement will provide that all stockholders of PRXV holding 1% or more of PRXV stock (**"Major Holders"**) will have the right to participate on a pro rata basis in subsequent PRXV equity financings, subject to customary exceptions.

**ROFR/Drag-Along/Tag-Along**: The Definitive Agreement will provide that except for customary permitted transfers, any PRXV stockholder who proposes to sell all or any shares of capital stock of PRXV based on a bona fide offer must first offer such shares to the company, then to the Major Holders pro rata.

In any liquidation or sale approved by a majority of the outstanding shares of PRXV, all stockholders shall be subject to a customary drag-along provision and Major Holders will have tag-along/co-sale rights.

**Information Rights**: Major Holders will be entitled to receive annual unaudited financials and quarterly business updates regarding PRXV and PersonalRx.

**Expenses; Required Commitment of Requisite Holders:** The parties will pay their own expenses of the exchange and restructuring, provided that PersonalRx will pay the fees of Noteholders' counsel up to $5,000.  Counsel for PRXV will draft the Definitive Agreement and ancillary documentation, to be done promptly upon receipt of signatures to this Term Sheet from the Noteholders constituting the Requisite Holders of each Note Tranche A through G.

**Confidentiality:** The parties agree not to disclose the terms of this Term Sheet to any third party at any time without the prior written consent of the other party(s), except that (i) each party may disclose this Term Sheet to its advisors or as required by applicable law, and (ii) PRXV management may disclose this Term Sheet to the shareholders of PRXV and PersonalRx, and to creditors of HTH.

**Binding Effect:** Except for the "Confidentiality" provision above, this Term Sheet reflects the intention of the parties to negotiate the terms and conditions of the transaction in accordance with the terms of this Term Sheet. For the avoidance of doubt, however, neither this Term Sheet nor its execution by any party shall give rise to any legally binding or enforceable obligation on any party, except with regard to the sections "Confidentiality", "Governing Law and Forum" and "Waiver of Jury Trial." No contract or agreement providing for any transaction shall be deemed to exist between any parties unless and until a final Definitive Agreement has been executed and delivered.

**Counterparts:** This Term Sheet may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Term Sheet and all of which, when taken together, will be deemed to constitute one and the same instrument.

4

**Governing Law and Forum:**    The laws of the State of Delaware shall govern the Definitive Agreement and this Term Sheet. Each party submits to the exclusive jurisdiction of the federal or state courts of Delaware with respect to any and all disputes, cases or controversies relating to the restructuring and this Term Sheet. All parties waive the right to trial by jury in any such litigation.

**DGN PHARMACY, INC.**

By:_____

Lawrence Margolis
CEO/President

**NOTEHOLDERS:**

_____

Name: